UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YALE M. FISHMAN 1998 INSURANCE TRUST and GLENN AKIVA FISHMAN LIFE INSURANCE TRUST | 11 Civ. 1284 |
| Plaintiffs, | **OPINION** |
| v. | |
| GENERAL AMERICAN LIFE INSURANCE CO., et al., | |
| Defendants. | |

Plaintiffs, the Yale Fishman 1998 Insurance Trust and the Glenn Akiva Fishman Life Insurance Trust, bring this putative class action on behalf of themselves and others who held certain insurance products sold by General American Life Insurance Company ("GenAmerica") and which lost value due to exposure to the Ponzi scheme perpetrated by Bernard Madoff. Against GenAmerica and its corporate parent Metropolitan Life Insurance Company of New York ("MetLife," collectively "Insurance Defendants"), they bring claims of common law fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of New York General Business Law ("GBL") § 349, gross negligence, negligent misrepresentation, unjust enrichment, and promissory estoppel.

1

They also bring derivative claims on behalf of certain Tremont funds in which their money was ultimately invested, the "Nominal Defendants," against the funds' general partner, Tremont Partners.  They also bring these derivative claims against Tremont Partners' corporate parent, Tremont Group Holdings, Inc. ("TGH"); another division of TGH, Rye Investment Management ("Rye", Tremont Partners, TGH and Rye are collectively known as "Tremont Defendants") which was responsible for the management of several of the nominal defendants; the corporate parents of TGH (Oppenheimer Acquisition Corp., MassMutual Holding LLC, and Massachusetts Mutual Life Insurance Co., collectively  "Control Defendants"); and several individual directors and officers of Tremont Partners and TGH ("Individual Defendants").

Defendants move to dismiss the complaint and the motion is granted.  Plaintiff does not have standing to bring derivative claims on behalf of nominal defendants, and each of its state law claims is precluded by the Securities Litigation Uniform Standards Act.  15 U.S.C. §§ 78bb(f), 77p(b).


## Background

Plaintiffs purchased variable universal life insurance policies ("VULs") from GenAmerica.  One characteristic feature of a VUL is that policyholders are able to choose how their premiums are to be invested from among the various investment options offered by the issuer of the policy.

GenAmerica provided plaintiffs the option of investing their premiums with what is now known as the Tremont Opportunity Fund.  Tremont Opportunity Fund is itself a "fund of funds" which invested its assets with other Tremont-managed funds, the Rye Select Broad Market Insurance Fund LP, the Rye Select Broad Market Prime Fund LP, and the Rye Select Broad Market XL Fund LP ("Rye Select Funds").  Tremont Partners served as General Partner of both the Tremont Opportunity Fund and each of the Rye Select Funds, and all four funds are named here as nominal defendants.

Assets managed by the Rye Select Funds were, finally, entrusted to Madoff. The fate of plaintiffs' funds, like many others', once it entered Madoff's hands is well known but, in short, much of plaintiffs' money was lost to the largest fraud in the history of finance.

Plaintiffs also seek to represent class members who purchased deferred variable annuities ("DVAs") from GenAmerica, the assets of which were exposed and ultimately lost to Madoff's Ponzi scheme through a similar route.

Plaintiffs allege that the Insurance Defendants caused these losses by, in essence, failing to perform the promised – or in any event, a reasonable amount of – due diligence on the Tremont Opportunity Fund.  Similarly, in their derivative claims, Plaintiffs argue that their losses would have been avoided had Tremont Defendants not mislead the Nominal Defendants about the steps being taken to safeguard their assets and managed their assets with a reasonable level of care.

3

**The Parties**

I. <span>PLAINTIFFS</span>

Named plaintiffs are both trusts holding VULs issued by GenAmerica, the funds of which were invested in the Tremont Opportunity Fund.  They seek relief both for themselves and others who purchased either VULs or DVAs from GenAmerica which lost value through exposure to Madoff's fraud.

II. <span>DEFENDANTS</span>

Plaintiffs bring claims against five groups of defendants: Insurance Defendants, Tremont Defendants, Control Defendants, Individual Defendants, and Nominal Defendants.

Insurance Defendants consist of GenAmerica, a provider of life insurance and annuity contracts, and its corporate parent MetLife, a financial services company.  GenAmerica is organized under the laws of Missouri and has its principal place of business in St. Louis, Missouri.  MetLife is organized under the laws of New York and has its principle place of business in New York, New York.

Tremont Defendants consist of TGH, Tremont Partners, and Rye.  TGH is a Delaware corporation with its principal place of business in Rye, New York.  It is the parent company of Rye and Tremont Partners and has also been known as Tremont Advisers, Inc. and Tremont Capital Management.  Tremont Partners is a wholly-owned subsidiary of TGH organized under the laws of

Connecticut and with its principle place of business in Rye, New York.  Rye is another division of TGH with its principal place of business in Rye, New York.

Control Defendants are the various corporate parents of Tremont Defendants: Oppenheimer Acquisition Corp. ("Oppenheimer"), Mass Mutual Holding LLC ("MassMutual"), and Massachusetts Mutual Life Insurance Co. ("MMLI").  Oppenheimer is the direct corporate parent of TGH.  It is a Delaware corporation with its principal place of business in New York, New York. MassMutual, in turn, is the corporate parent of Oppenheimer with its principal place of business in Springfield, Massachusetts.  Finally, MMLI is the corporate parent of MassMutual (and, therefore, the corporate great-grandparent of TGH) and also has its principal place of business in Springfield, Massachusetts.

Individual Defendants are all former officers and directors of various Tremont Defendants.  They include Sandra L. Manzke and Robert Schulman, as well as a number of other officers, directors, and "decision-makers" of TGH and Tremont Partners.  Ms. Manzke, a resident of Palm Beach, Florida, is a Tremont founder who served as CEO of Tremont Partners and co-CEO of TGH until April 2005.  Robert Schulman was Ms. Manzke's successor at Tremont Partners, serving as its CEO from April 2005 to 2008.  He also served as co-CEO of TGH from 1994 to April 2005 and CEO of Rye until 2008.

Nominal defendants Tremont Opportunity Fund III LP, Rye Select Broad Market Insurance Fund LP, Rye Select Broad Market Prime Fund LP, and Rye

Select Broad Market XL Fund LP are all investment funds organized under the laws of Delaware

## Substantive Allegations

Plaintiffs provide great detail regarding Madoff's fraud, the red flags that defendants allegedly could have detected but did not, the control relationships between the defendants, and the defendants' alleged financial incentive to turn a blind eye to the fraud.  Their allegations regarding representations made by the defendants, on the other hand, are rather sparse.

Insurance defendants are said to have described the Tremont Opportunity Fund as having the objective of providing consistent returns while preserving investors' capital.  This representation was made in an appendix to a 2001 Private Placement Memorandum ("PPM") prepared and issued by insurance defendants which purported to describe the investment account options available to policy holders.

In 2008, insurance defendants provided plaintiffs a PPM for the Tremont Opportunity Fund.  This memorandum represented that Tremont Partners (as the general partner of the Tremont Opportunity Fund) would be able to obtain sufficient information about its investment managers to select them effectively, and reiterated the fund's investment goals as summarized in the 2001 PPM. Plaintiffs studiously avoid specifically alleging who authored this PPM, but it seems clear that this PPM would have been authored by Tremont, not

insurance defendants.  In any event, the complaint contains no allegation that insurance defendants authored the 2008 PPM, only that they distributed it to plaintiffs.

Finally, plaintiffs allege that insurance defendants created the impression that it had vetted the Tremont Opportunity Fund by listing it as an investment option under their VUL policies.

However, plaintiffs allege that insurance defendants did none of these things that they represented they would do.  They claim that their funds were not ultimately invested in such a way that they might achieve consistent returns – in fact, they were not invested at all – and that insurance defendants did not adequately investigate the managers of the funds to which plaintiffs' money was entrusted.  On the contrary, plaintiffs allege that insurance defendants overlooked numerous red flags that should have revealed the fraud. Had insurance defendants vetted the Tremont Opportunity fund, noticed the red flags, plaintiffs allege that they either would not have invested in the Tremont Opportunity Fund or would have removed their money from it before the money was lost.

As for Tremont, plaintiffs allege that it had a close relationship with Madoff, based largely upon a close personal relationship between Schulman, CEO of Tremont Partners, TGH, and Rye for much of the time period at issue, and Madoff.  However, despite this close relationship, and Tremont's representations that it would closely monitor all of the funds in which it

7

invested, plaintiffs allege that Tremont failed to notice numerous, conspicuous red flags.  Tremont failed to notice these red flags, plaintiffs allege, because it did not perform the due diligence the way it said it would.  Plaintiffs also claim that Tremont described its investment strategy as relying on multiple managers when, in reality, it entrusted its investors' money to only a single manager: Madoff.

Plaintiffs ascribe this lack of oversight to Tremont's desire to continue collecting management fees from the ever growing pool of investment assets that their Madoff affiliation was attracting.

Finally, plaintiffs allege that Oppenheimer controlled Tremont through common directors and executives.  Oppenheimer, in turn, was controlled by MassMutual and MMLI by virtue of their majority ownership of the company and through common officers and directors.

## Legal Standard

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face.  Ashcroft v. Iqbal, 556 U.S. 662, (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of its legal conclusions.  Iqbal, 556 U.S. at 678-79.  A court must also draw all reasonable inferences in the plaintiff's favor, and it may consider documents attached to

the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit.  <u>ATSI Commc'ns, Inc. v. Shaar Fund. Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007).

I. <u>Plaintiffs Lack Standing to Bring Derivative Claims on Nominal Defendants' Behalf</u>

Plaintiff and defendant dispute whether Delaware or New York law governs the question whether plaintiffs have standing to bring a derivative suit. Defendants argue that Nominal Defendants are organized under the laws of Delaware and, thus, Delaware law should govern disputes involving their internal affairs.  Plaintiffs argue that New York law should apply because New York has the stronger interest in the litigation.

However, the correct answer is clear: throughout the country, and no less in New York, disputes involving an organization's internal affairs are typically governed by the laws of the state in which the entity was organized.  <u>Hausman v. Buckley</u>, 299 F.2d 696, 702 (2d Cir. 1962).  In fact, in New York, the internal affairs rule is written into statutory law.  <u>See</u> N.Y. P'Ship Law § 121-901.

Moreover, it appears that the parties' choice-of-law dispute is over nothing because the same result obtains under New York and Delaware law.  Therefore, while the court should apply Delaware law to the standing question, an identical analysis would be made under the laws of New York.

Within the context of a limited partnership, a derivative claim allows a limited partner to sue on behalf of the general partner.  <u>Litman v. Prudential-Bache Props., Inc.</u>, 611 A.2d 12, 15 (Del. Ch. 1992).  This mechanism allows the limited partner to force the general partner to live up to its fiduciary duty by suing a third party to enforce the general partner's rights for the benefit of the limited partners.

A double derivative suit is simply a vehicle for bringing a derivative suit across a second degree of separation.  Typically this takes the form of a suit brought by shareholders of a parent company to assert the rights of a subsidiary.  <u>See e.g.</u>, <u>Lambrecht v. O'Neal</u>, 3 A.3d 277, 282 (Del. 2010).  A double derivative action is also possible in an analogous situation involving limited partnerships.  <u>See, e.g.</u>, <u>Flynn v. Bachow</u>, C.A. 15885, 1998 WL 671273 (Del. Ch. Sept. 18, 1998).  And, while there seems to be no exemplar in Delaware law, there is no reason a double derivative suit could not be maintained across heterogeneous organizational structures: e.g., when a limited partner seeks to sue on behalf of a corporation in which the general partner is a shareholder, or when a corporate shareholder seeks to sue on behalf of a partnership of which the corporation is a limited partner.

The last of these possibilities appears to be closest to the model suggested by plaintiffs: they claim to stand in the shoes of the insurance defendants, a limited partner in the Tremont Opportunity Fund, in bringing a derivative suit on behalf of the fund.  But while such a suit is possible in principle, these

10

plaintiffs do not have the requisite legal relationship with the insurance defendants to stand in their shoes.  A derivative plaintiff must be a *share*holder, but plaintiffs are merely *policy*holders.[1]  Therefore plaintiffs do not have standing to sue derivatively on behalf of nominal defendants.[2]

## II. Plaintiffs' Derivative Claims are Barred by the Doctrine of *Res Judicata*

"Under *res judicata,* a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94 (1980).  To assert a defense of *res judicata* "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000).  However, literal privity between plaintiffs is not always required.  One whose interests were adequately

---

[1] Plaintiffs offer language from a 1944 Second Circuit opinion which suggests a conceptual generalization of the examples provided above: that a double derivative suit might be possible whenever a plaintiff seeks to force his fiduciary to compel her own fiduciary to act, thus suing on behalf of his fiduciary's fiduciary. Goldstein v. Groesbeck, 142 F.2d 422, 425 (2d Cir. 1944).  Even if this were the law of Delaware today, it would not be of any help to plaintiffs: they have not provided any facts to support the legal conclusion that insurance defendants are their fiduciaries.  On the contrary, their relationship is governed by a contract that explicitly provides that plaintiffs have exclusive control over the assets invested through their policy, and that plaintiffs should consult with their own investment advisors before making any investment decisions.

[2] Plaintiffs also assert in their opposition papers that they have standing to bring a direct action against Tremont.  But their complaint contains no direct claims against Tremont to which this standing argument could be relevant.

represented by another vested with the authority of representation is bound by the judgment, even though the first party was not formally a party to the litigation.  Alpert's Newspaper Delivery Inc. v. N.Y. Times Co., 876 F.2d 266, 270 (2d Cir. 1989).

Derivative suits present one such situation.  Because a derivative plaintiff stands in the shoes of the nominal defendant in asserting the nominal defendant's rights, judgments on the merits in derivative suits bar additional claims by the nominal defendant and, in turn, future derivative claims brought on the nominal defendant's behalf.  Judgments on the merits in suits brought directly by a party can also preclude future related derivative litigation in which that party is named as the nominal defendant.  See, Smith v. Alleghany Corp., 394 F.2d 381, 391 (2d Cir. 1968); Greco v. Local.com Corp., 806 F. Supp. 2d 653, 658 (S.D.N.Y. 2011).  Accord Louisiana Mun. Police Emps' Ret. Sys. v. Pyott, 46 A.3d 313, 327-35 (Del. Ch. 2012).

Because this principle creates the possibility that a later would-be plaintiff could be prejudiced by the actions of prior plaintiffs with potentially differing interests, notice must be given to other potential plaintiffs (typically other shareholders or members) before the entry of a stipulated judgment in a derivative suit.  See Papilsky v. Berndt, 466 F.2d 251, 257-58 (2d Cir. 1972); Fed. R. Civ. P. 23.1.  Similarly, in evaluating the preclusive effect of a prior judgment, courts verify the alignment of the earlier and later plaintiffs' interests, much as they do in initially evaluating the suitability of a derivative

plaintiff.  <u>Chase Manhattan Bank, N.A. v. Celotex Corp.</u>, 56 F.3d 343, 346 (2d Cir. 1995).

In this case, plaintiffs are hardly the first to bring derivative claims against the Tremont and Control Defendants on the nominal defendants' behalf. Similar or identical claims were asserted on their behalf in the consolidated state law action which was disposed of on the merits by the Final Judgment and Order of Dismissal issued by this court on August 19, 2011.

Plaintiffs do not contend that they did not receive notice of the settlement that produced that judgment, that the prior derivative plaintiffs did not adequately represent their interests, or that the prior derivative plaintiffs' interests were contrary to their own.  They also do not dispute that the prior judgment was a judgment on the merits or that the claims they raise here could not have been raised then.

They argue only that they cannot be bound by the prior judgment because they were not a party to it.  But this is simply not the law as it relates to derivative actions.  Therefore, even if plaintiffs were to have standing to bring their derivative claims, the claims would be *res judicata*.

III.  <u>Plaintiffs' Direct Claims are Barred by SLUSA</u>

The Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §§ 78bb(f), 77p(b), ensures that plaintiffs cannot avoid the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 by finding

state law vehicles for their securities fraud claims.  See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 82 (2006).  Thus, SLUSA bars class actions brought under state law that allege "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1)(A).

It is undisputed that this action is a "covered class action" as SLUSA defines the term.  It is also not disputed that plaintiffs bring claims only under state law.  The dispute centers on the question of whether the action alleges a "misrepresentation or omission ... in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1)(A).

The difficulty in applying SLUSA in this case and others lies in properly interpreting the phrase "in connection with."  The Supreme Court has instructed that SLUSA's operative language must be read broadly to cover not only purchasers and sellers of covered securities but also claims where the fraud alleged "coincides with" a covered securities transaction by someone else.  See Dabit, 547 U.S. at 85.  It is therefore unnecessary that the misrepresentation be made to a purchaser or seller in order for it to have been made "in connection with" a sale.  See id. at 85.  This "purchase or sale" requirement is to be "construed not technically and restrictively, but flexibly."  S.E.C. v. Zandford, 535 U.S. 813, 819 (2002).

Courts in this Circuit have held that SLUSA preempts a variety of claims brought by investors to recover assets lost due to the Madoff Ponzi scheme.

14

Notably, these include not only suits alleging fraud against Madoff himself but also suits brought against investments funds that were alleged to have breached their duties to investors by failing to detect the fraud.  See Barron v. Igolnikov, 09 CIV. 4471 (TPG), 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010) (collecting cases).  These cases clearly establish that a class action alleging that plaintiffs were deceived into investing in a fund, the assets of which were then fed into a scheme in which securities were claimed to be purchased, are barred by SLUSA.  This is true whether or not securities were ever actually purchased and regardless of whether plaintiffs were induced to invest by the promise that securities would be purchased.  Furthermore, in such an action the fraudulent "center of gravity" of the complaint has been found to taint related claims including negligent misrepresentation, breach of contract, and breach of fiduciary duty.  See, e.g., Id.; Levinson v. PSCC Servs, Inc., 3:09-CV-00269 PCD, 2009 WL 5184363 (D. Conn. Dec. 23, 2009).

Recent Second Circuit authority confirms that the "in connection with" requirement is to be construed expansively to cover any conduct within the same scheme as the sale (whether actual or merely purported) of securities. See Romano v. Kazacos, 609 F.3d 512, 524 (2d Cir. 2010); Backus v. Connecticut Cmty. Bank, N.A., 789 F. Supp. 2d 292, 307 (D. Conn. 2011). And that is certainly the case here.  Plaintiffs allege that insurance defendants caused them to invest in the Tremont Opportunity Fund through a fraudulent scheme to misrepresent the fund's investment strategy and the due diligence

being conducted by and on the fund.  Plaintiffs were harmed when, in deviating from its stated investment strategy, money was simply paid into the Madoff Ponzi scheme instead of being invested in securities.

Therefore, because the gravamen of plaintiffs' class action alleges misrepresentations as part of a scheme involving the purported sale of securities, SLUSA bars plaintiffs' use of the class action vehicle for bringing their direct claims against insurance defendants.

## Conclusion

Defendants' motions to dismiss should be granted and, accordingly, plaintiffs' complaint should be dismissed.

This resolves the documents listed as numbers 36, 40, 43, 46, and 48 on the docket of case 11 Civ. 1284.

So ordered.

Dated:  New York, New York
       March 7, 2013

Thomas P. Griesa
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 7, 2013